Mr. Bridges, you have reserved three minutes for rebuttal, so that gives you seven out of the gate. Let me proceed. May it please the Court, Jonathan Bridges for Appellants. This case presents an unprecedented question, whether the reverse split of an exchange-traded note can plausibly amount to the sale of a security. Our best authority is the language of the statute. Their best authority, I submit, is a single sentence from a professor's treatise. The plain language of the statute, Section 2A.3 of the 33 Act, would seem to settle the issue. It defines sale as including any disposition of a security for value. Using the ordinary meaning of the term value, the securities exchanged by appellants in the four-for-one reverse split meet this definition. The District Court- Why isn't the definition consideration? That should be some consideration to be a value. Is that not the right definition? I believe that is a fair way of defining it, Your Honor. What's the consideration in a reverse stock split? There's no change in value, right? With a stock split, I think it's a very different argument than a note split, any debt security,  I'm sorry? Why is that so? You're saying this is a note split and also a reverse stock split, and that makes a difference? The reverse split of a debt- Explain that. I don't understand that argument. Yes, Your Honor. The reverse split of a debt instrument is not something that just renumerates underlying assets. Instead of underlying assets, like a stock or equity transaction has, a note is actually the asset itself. And when one is retired or canceled and a new one is put in its place, there is that change of the underlying asset.  Is there a change of value? Yes, Your Honor. I submit that there is, by definition, because the previous security is terminated and exchanged for a new one. But what's the difference between a stock and debt, equity and debt, if that is your rationale? Yes, Your Honor. The difference is that the note security isn't reflecting something underlying it. That's the distinction we're relying on. Further, Your Honor, two things happened as a result of the split. What we had prior to the split was a security with two exit strategies. Either redemption was available to appellants or, alternatively, sales on the open market. After the split, the security became essentially unsellable because the first, redemption, by the quadrupling of the number of units, of notes, appellants became ineligible to redeem. And, secondly, on the open market, Your Honor, that was foreclosed because of the commingling of registered and unregistered notes in the reverse split. In other words, 43%- Was his wealth improved or diminished in any way by the reverse stock split? Yes, because of the illiquidity after the split, Your Honor. Again, because of Section 2- The value of it was changed. I mean, assuming you could make a sale. Maybe it was harder to make the sale. I don't know. But was the value changed? In other words, he wasn't getting more money or less money for redeeming it, right? If eligible for redemption, I understand Your Honor's point. If ineligible, and frankly, the vast majority of these are not redeemed. They're designed, they're exchange-traded notes. By design, they're to be traded on the open market. By taking that away, making what was- They didn't take that away because they reserved that right originally at the time of the purchase. This is a right that they retained to do when the note was issued, right? In exchange for the consideration of offering a new note, yes. So that was, I think, Judge Lyman's point then, that this was already factored into the price. And so the note, the value really didn't change. You're right that that's Judge Lyman's point, Your Honor. I agree with that. Where I disagree with Judge Lyman's analysis is his conclusion that nothing new was exchanged. When in reality, what happened is the notes in the hands of the appellants became unsellable, unmarketable. They no longer could go to the open market and say, We have unregistered shares that can be traded here without violating Section 5 of the Act and violating the exchange rules on the Chicago Board of Trade. Did you make the unregistered arguments in front of Judge Lyman? Yes, Your Honor. A further point on this. Barclays paid cash for the ETN fractional shares. And that may be de minimis, but it illustrates the counterfactual point here of Barclays' argument that cash for fractional shares shows that the underlying notes must have some value. The statutory scheme also provides support for appellants' interpretation. Mr. Cohen's 1959 address on the repeal of SEC Rule 133 explains why. A no-sale interpretation, Cohen explains, would not only take the reverse split out of the registration requirements of Section 5, application of the anti-fraud provisions of Section 17 are also triggered by a sale. Thus, a no-sale interpretation would undermine the SEC's enforcement authority, which derives from Section 17, and that is a bridge too far. The statutory scheme contemplates that later exercises of the rights accompanying a security can be for value, can amount to a sale, and ordinarily would amount to a sale because that is what makes them subject to the SEC's enforcement powers. This is true even though splits might become exempt. What about the fact that there was no investment decision, that this was automatic? How should that be factored into the analysis? Your Honor, that's a policy issue that cannot trump the plain language of the statute. And the statute defines, as we were just discussing, it defines this relationship of a right or a privilege that comes with a security is a sale and therefore must have value at the time of the exercise of that right or privilege. So under your approach, this wouldn't just apply to notes. This would apply to any stock, a stock as well, right, over a stock split? Or you're saying this would be limited to notes? Your Honor, a forward stock split is a very different animal. And I don't think that a holding here would address that. But I guess I'm still confused. It seems to me that it's a disposition of a security for value. And so what is the value difference or exchange here? And two things. Excuse me, this is just an arithmetic exchange. Four for one. So what is the value exchange that's different than that? That the four for one change with the unregistered commingling created an unsellable, an unmarketable security. Well, that's you saying that the stock split is undesirable. But it's not clear to me that it's a comment on whether or not value was exchanged. So, I mean, the question is whether there's some consideration or some exchange between the two parties to this transaction. And it looks like the only transaction is I give you four, you give me one. Is there something else happening? There is the cash for fractional notes as well, Your Honor. Right, but that's based on the same four for one ratio, right? It is. It is cash. So in the simple analogy that our hypothetical rookie, your adversary uses in the brief, taking a $20 bill and taking four $5 bills and handing them over to somebody and getting a $20 bill, that nothing's changed in terms of value. It has changed if the four $5 bills had no liquidity issues and the $20 bill does, Your Honor. I yield. I reserve the rest of my time, if I may. All right, thank you. You've got three minutes for rebuttal. We'll now hear from Mr. Porcora. Good morning. May it please the Court. Matthew Porcora of Sullivan and Cromwell for the appellees. Your Honors, in their reply on this appeal, plaintiffs chose not to address a single one of our arguments about why their Section 11 claim fails. So I'm going to focus the majority of my argument on the only claim that plaintiffs appear to be seriously pressing on appeal, their Section 12A1 claim, that part of it is back sold among registered securities. The District Court was correct in finding that that claim fails. There are two reasons this Court should affirm. First, the District Court was correct that plaintiffs failed to plead that they purchased unregistered securities directly from Barclays. The problem for plaintiffs is that they admitted they purchased their VXX ETNs on the secondary market. To try to solve for that, plaintiffs make this highly technical, misguided argument. They say that the ETNs they purchased in the secondary market transformed into purchases directly from Barclays after Barclays executed a reverse split on April 23, 2021. The District Court correctly rejected that argument because the reverse split was not a disposition of a security for value, as was just discussed, and that's required to constitute a sale of a security under the Securities Act. That ruling undoubtedly is correct and it dooms plaintiffs' claims. Second, even if this Court were to accept plaintiffs' strained argument that the reverse split somehow constituted a sale, plaintiffs did not and they cannot allege any damages attributable to the reverse split, and that's an additional reason to affirm. Let me start with point one, the reverse split was not a sale. To state a claim under Section 12A1, plaintiffs must plead that they purchased unregistered VXX ETNs directly from Barclays in a transaction that qualifies as a statutory sale, meaning, again, a disposition of a security for value. Plaintiffs contend that even though they purchased their ETNs on the secondary market, Barclays made a statutory sale directly to them with respect to the subset of those ETNs that were subject to the reverse split in April of 21. Plaintiffs' theory is that because those ETNs underwent a reverse split, the conversion of four ETNs into one ETN constituted a sale for value of an unregistered VXX ETN. I think we understand their argument. So their response... You got it, Your Honor. There are three reasons why that argument fails. First, the reverse split was not a sale because it merely modified the denomination of the plaintiff's security. The reverse split was for equal value. Four ETNs, each with an indicative value of $10.41, were replaced with one ETN with an indicative value of $41.64. I think their core argument is that there was a change in value because it became unmarketable for purposes of redemption. What's your response to that? Yes, Your Honor. First of all, that was not argued before Judge Lyman. Yeah, I was going to ask you about that. I didn't see that being argued. Right. That was not argued before Judge Lyman. About the fact that some of them were unregistered and therefore couldn't be sold on the secondary market. That's correct, Judge Sullivan. That's a new argument that they made for the first time on appeal, so it's inappropriate. But even leaving that aside, it doesn't work here. And that's because plaintiffs conceived that that was the situation or the case with respect to the securities prior to the reverse split. In other words, the securities that they maintain they purchased on the secondary market, they claim were unregistered. They then say that they were subject to a reverse split and that commingled unregistered securities with registered securities, but that doesn't make them any less marketable than they were before. Their other argument, though, is that the $25,000 share threshold, they fell below that and that makes it less liquid. Yes, Judge Bianco, and I'll get to that in just one moment. Just one other thing about this idea that these securities were unmarketable. At the time of the reverse split, the market didn't know that the securities were unregistered. After that reverse split occurred, it was another year or so until Barclays learned about the over-issuance mistake. So the idea that they couldn't have sold those securities has no basis in fact there either. With respect to the argument, Judge Bianco, that you just mentioned, that's an argument that the plaintiffs have that, in fact, there was value provided, but there wasn't. And I think Judge Sullivan may have mentioned this in response to my friend's argument, but as Judge Lyman expressly said, the issue about redemption with respect to you need to have 25,000 shares, that was already baked into, the reverse split was already baked into the contract the plaintiffs purchased their securities pursuant to. So there was no new additional value added when the reverse split occurred. That encumbrance was not something of value that Barclays obtained as a result of the reverse split. It certainly wasn't something that the plaintiffs provided. Plaintiffs all along owned a security over which Barclays could choose to exercise the reverse split. And as the district court correctly held, and I'm quoting, even assuming that the exchange provided a business benefit to Barclays and a detriment to certain holders who found themselves suddenly unable to redeem holdings that they previously could, Barclays already had that benefit and the right to inflict that detriment in the form of an exercisable contractual right. As a result, the plaintiffs didn't part with anything. Your Honor, there really are three reasons why the district court's opinion was right. First, again, it really was the reverse split, only the change in denomination of the plaintiff's securities. Again, this was a no-value transaction for ETNs for one same value. This is just like the metaphor that we mentioned in our brief, which Judge Walker mentioned. No one would consider it a sale if you asked a cashier to give you $4 or $5 bills in exchange for one $20 bill or vice versa. $20 is $20 regardless of how it's denominated. Well, I guess, I mean, if it were a $1,000 bill, it would be hard to break and get gum. But, I mean, it seems to me that that, again, is already baked into the fact that it's legal tender and people can do that. That's exactly right, Judge Sullivan. The other reason that their argument fails is that based on basic contract principles, and this is exactly what Your Honor was just referring to, plaintiffs purchased those VX ETNs pursuant to their offering documents, and that expressly stated that Barclays had a contractual right to conduct the reverse split. The third reason, and, again, this was referenced in my friend's argument, the reverse split was not a sale because plaintiffs didn't make any investment decision in connection with it. The Securities Act Section 5 registration requirement exists to ensure investors have information needed to make informed decisions. And that's not just a policy argument. The Supreme Court made that quite clear in the Pinto v. Dahl decision. Here, there was no investment decision to be made. Barclays simply executed, or, excuse me, exercised its unilateral right to execute the reverse split. As the district court correctly recognized, where there's no decision for the investor to make, there is no need to provide information to make such non-existent decision, an informed one. And, Your Honors, the authorities agree. There's no basis for the argument that there's one sentence in a treatise that we rely on. In the one court decision right on point, Gurvitz v. Bregman, Judge Garfin of the SDNY held that a stock split is not a sale. Instead of simply the distribution of two or more pieces of paper for one, excuse me, instead it is simply the distribution of two or more pieces of paper for one, and thus it's not a sale under the Securities Act. The same exact rationale applies with respect to reverse splits, which simply condense two or more pieces of paper. I guess the question is, is there something magical about debt? Your Honor, there isn't. The plaintiffs make that argument on appeal, but they never offer any real reason that that distinction amounts to a difference. Whether debt or equity, plaintiffs had no decision to make in connection with the reverse split. Another argument that plaintiffs make is they argue that the reverse split was for value by arguing that it was akin to an exchange of equivalent value, such as when a security is bought in exchange for cash. But initiating the reverse split at issue here, there's no resemblance to buying a security for cash. That type of transaction involves, number one, an investment decision, and number two, an exchange of assets with different risk profiles. Both of those features are notably absent from the reverse split, and therefore they're not a sale. Another argument plaintiffs make, and they made this for the first time in their reply brief, they criticized the district court's analogy to options. So even aside from the impropriety of raising that for the first time in a reply and depriving Barclays the chance to respond, the argument's dead wrong. To make it, the plaintiffs rely on a quotation they say is in the loss treatise on the fundamentals of securities regulation. They use this quote. Your Honors, we've been unable to locate any such language in the loss treatise or in any other treatise, presumably because all the authorities say the exact opposite. The Haysen treatise that the plaintiffs cite liberally states in Section 5.3, purchases and sales of options for value clearly constitute sales and purchases of securities, but an options exercise ordinarily does not involve additional value. That's relatively obvious. That's basic contract principles, Your Honor. The sale occurred when the contract is made, not when one party later exercises an agreed-upon contractual right. In a last-ditch effort, Your Honors, plaintiffs argue that Barclays Bank admitted that the reverse split was a sale for value. They point to a press release that Barclays Bank issued in advance of the split. They also point to a pricing supplement. We lay out in our papers why neither of those materials in any way represent that the reverse split was a sale, so I'm not going to belabor that here. I'll end very briefly just by mentioning the additional ground for affirmance. Even if this Court were to construe the reverse split to be a sale by Barclays to plaintiffs, it would make no difference. The only remedy for a violation of Section 12A1 is recovery of the consideration paid for the security. Because the plaintiffs did not pay any consideration in connection with the reverse split, they have no damages for any claim that they received in unregistered security as a result of that split, and therefore the Section 12A1 should be dismissed on those basis as well. So for all those reasons or the reasons set forth in our brief, dismissal should be effective. All right. Thank you, Mr. Porcora. We'll now hear from Mr. Bridges for three minutes of rebuttal. May it please the Court. It may be that we were less eloquent or concise before the district court about our point regarding non-salability, but the arguments were made. They're made in our opening brief at pages 30 through 31. The new ETNs did not become freely tradable by virtue of this exchange, which is likely why Barclays ultimately registered all existing notes on May 23rd, 2022. The argument we repeated in our briefing below is that you cannot convert, you cannot wash unregistered shares. Did they re-register these notes? They re-registered all outstanding VXX. Well, but they'd already been registered when there were more of them. And because of the combining. So why didn't that cover anything that would happen thereafter, given the fact that the reverse split was built into the contract? I'm not sure I understand, Your Honor. The reverse split was part of what was a condition that was pertained at the time of the initial offering, right? When there were four, that before the four became one, that was subject to registration. And didn't that registration also cover after the reverse split, cover the remaining security? A year after the reverse split, the registration of all outstanding VXX shares took place. And yes, Your Honor, I do believe that. So there were two registration statements covered, one security? I think that's a fair way to look at it, Your Honor. In fact, earlier. Assuming that you assume that the second issue was a registration, you have to reach to get there, right? It wasn't a normal registration statement. Yes, Your Honor. A year after the fact, after the over issuance was disclosed and conversations with the SEC negotiations were happening, Barclays then, after its public announcement, re-registered all of VXX across the board. So it had been registered earlier. We're arguing that it should have been registered at the time of the reverse split a year and a month later in May of 2022. It was all registered. Can I just ask you what the damages would be? How can you articulate what the damages would be here? Rescission, Your Honor. Not damages and the equitable relief of rescissionary damages for those who have sold at a later time. But the fact you only asked for rescission would show there's no monetary damage, right? There's no monetary damage, right? Respectfully, Your Honor, I think you're right only if you adopt the view that no consideration was exchanged. If instead you adopt our view that the exchange of the four for one had value and was a sale, then the value of the four is the measure of that. The 12A1 claim is a simple allocation of risk issue. The risk is allocated to us. If they follow the rules, they didn't. Our liquidity was significantly impaired as a result. This is a foreign bank that brought ETNs to our shores for profit. It is only just to hold them strictly accountable under the law. This would not be a win-win.